UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| JOHN T. HAWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:19-CV-73 PLC |
| | ) | |
| ANDREW SAUL,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER

Plaintiff John Hawn seeks review of the decision of Defendant Social Security Commissioner denying his application for Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

I.       Background

In June 2016, Plaintiff, who was born October 1966, filed an application for SSI alleging he was disabled as of February 2, 2015[2] as a result of "seizure disorder, worsening COPD, rheumatoid arthritis, worsening depression, fibromyalgia, worsening pain in back, asthma, [and] fatigue."[3] (Tr. 81, 197-201) The Social Security Administration (SSA) denied Plaintiff's claim, and he filed a timely request for a  hearing before an administrative law judge (ALJ). (Tr. 97, 136-38) The SSA granted Plaintiff's request for review and conducted a hearing in April 2018. (Tr. 38-79)

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted pursuant to Fed. R. Civ. P. 25(d).

[2] Plaintiff later amended the alleged onset date to October 28, 2016, his fiftieth birthday. (Tr. 217)

[3] Plaintiff's previous applications for SSI and Disability Insurance Benefits were denied in August 2012. (Tr. 81)

In a decision dated August 6, 2018, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 416.920 and concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act[.]"  (Tr. 12-30)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review.  (Tr. 1-8)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

**II.      Evidence Before the ALJ[4]**

Plaintiff testified that he had a high school education and lived with his thirteen-year-old daughter.  (Tr. 47)   Plaintiff's most recent employment, maintaining production equipment at a factory, ended in 2009 when he was fired because he "smelled like alcohol."   (Tr. 48-50) Plaintiff stated that he had been sober for "a little over four years."  (Tr. 50)

Plaintiff testified that he suffered osteoarthritis in his hands, elbows, and knees.  (Tr. 51) Plaintiff estimated that his fingers were stiff "a couple of hours every day" and he had difficulty typing and picking up and holding things such as coffee cups or bowls.  (Tr. 52-53)   This problem has been ongoing for "about five years" and was "getting steadily worse."  (Tr. 54) Plaintiff also had Raynaud's disease, which affected the circulation in his hands and made his fingers numb in cold temperatures.  (Tr. 51-52)

Plaintiff stated that his elbows "get stiff" and he could not raise his right arm "over my shoulder height."  (Tr. 54)  Plaintiff was able to hold his right arm "out in front of me" and could use his hands with his "arms out in front of [him] … [as] long as I'm not picking up anything small."  (Id.)  Plaintiff also experienced pain in his right shoulder "maybe once or twice a week … if I do something to aggravate it," such as vacuuming or driving.  (Tr. 54-55)

---

[4] Because Plaintiff does not challenge the ALJ's determination of his mental RFC, the Court limits its discussion to the evidence relating to Plaintiff's physical impairments.

In regard to his knees, Plaintiff explained:  "[M]y doctor said they're bone on bone, and they – if I'm trying to bend down, squat down, they'll pop and crackle and it's a little bit painful, and it makes it hard to get back up."  (Tr. 63)  Plaintiff treated his joint pain with alternating hot and cold pads three of four times per week, which "seems to break the pain down."  (Tr. 63)

Plaintiff testified that he "had two crushed vertebras in my thoracic back, and then I have two herniated discs in my … lumbar back."  (Tr. 55)  Plaintiff's lower back pain "kind of goes down my legs … all the way to my calves."  (Tr. 56)  Plaintiff described the pain as "a stabbing pain, like somebody stabbing knives in [the] back of my legs."  (Id.)  Plaintiff suffered lower back pain for twelve to fifteen hours a day, and he experienced the leg pain "maybe once or twice a day" for about an hour.  (Tr. 56-57)

Plaintiff stated that he had fibromyalgia, which mainly affected his feet, explaining that "[i]t's just like needles sticking in my feet when I walk.  My arches of my feet, they hurt real bad."  (Tr. 60)  Plaintiff could walk about one hundred feet "without my feet bothering me" and stand for about twenty minutes.  (Tr. 61)  Plaintiff also suffered restless leg syndrome, and he usually awoke three or four times per night due to pain, which "feels like somebody stabbed me in the legs and my back."  (Id.)

Plaintiff had difficulty breathing and used inhalers and a nebulizer twice a day.  (Tr. 57)  Plaintiff estimated that he could only walk about one hundred feet or play catch with his daughter "maybe fifteen minutes" before becoming short of breath.  (Tr. 58-59)  Plaintiff would then need to use his inhaler and sit down for about twenty minutes.  (Tr. 59)  Plaintiff's respiratory problems had "been that severe for four or five years" and "it doesn't seem like it's changing."  (Tr. 58)

3

When asked to rate "all of [his] pain together," Plaintiff stated that his average pain was "five to six" and his worst pain, triggered by activities such as walking or cooking, was an eight or nine.  (Tr. 69-70)  When lying down, Plaintiff's pain would "get down to a four."  (Tr. 70)  Between 9:00 a.m. and 5:00 p.m., Plaintiff spent about six hours laying on the couch because it made his back feel better.  (Tr. 59-60)  Plaintiff napped throughout the day because the methadone he took for pain "makes me really tired."  (Tr. 60)  In addition to methadone, Plaintiff took Mucinex, cyclobenzaprine, Lyrica, Combivent, Dulera, Duloxetine, montelukast, Spiriva, and gabapentin.  (Tr. 60, 62)

In regard to his hearing loss, Plaintiff stated that "[i]t's hard for me to hear people," but he denied having any difficulty hearing the ALJ.  (Tr. 68)  Finally, Plaintiff testified that his seizure disorder was controlled by medication and his pancreatitis had not bothered him for three or four years.  (Tr. 62-63)

Plaintiff estimated that he could stand "about ten minutes" before his back started hurting and "probably about 20 minutes" before the pain started going down his legs.  (Tr. 57)  Plaintiff stated that he could sit for thirty minutes before he needed to change positions, and he could stand for about thirty minutes before needing to sit or lie down.  (Tr. 67-68)  In an eight-hour day, Plaintiff could stand comfortably "[m]aybe four hours" and sit for "maybe two" hours.  (Id.)  During a typical week, the farthest Plaintiff walked "[p]robably the 150 feet to the mailbox[.]"  (Tr. 68)  The heaviest thing Plaintiff was able to lift was a gallon of milk.  (Id.)

When the ALJ questioned Plaintiff about his activities of daily living, Plaintiff testified that he did "most of the cooking" and "some of the … picking up."  (Tr. 66)  Plaintiff was unable to vacuum, and his daughter helped with laundry by removing clothes from the frontload dryer.  (Id.)  Plaintiff sat on a chair while he cooked and he washed the dishes "a little at a time … as

I'm cooking, if I empty out a pan I go ahead and wash it so I don't have a bunch of dishes built up." (Id.)  Plaintiff grocery shopped with his daughter's help for about half an hour at a time. (Tr. 64-65)  At the store, Plaintiff leaned on the shopping cart and his daughter "usually gets the stuff off the lower shelf for me … so I don't have to bend over."  (Tr. 65)  Plaintiff and his daughter both carried the groceries into the house and put them away, but Plaintiff would then need to lie down for about an hour.  (Tr. 65)  Plaintiff could drive for thirty minutes before needing to stop.  (Tr. 48)

A vocational expert also testified at the hearing.  (Tr. 70-77)  The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience who was able to perform light work with the following limitations:

> [T]his individual is only going to be able to occasionally push or pull with the bilateral upper extremities; [never] use foot controls with the bilateral lower extremities.
>
> [T]his individual is never going to be able to climb ladders, ropes or scaffolds; could occasionally climb ramps or stairs; occasionally balance, stoop, and crouch; but never kneel and never crawl…. And this individual can never perform overhead reaching with the bilateral upper extremities.  This individual's handling of objects, that is gross manipulation, is limited to frequently with the bilateral upper extremities; the fingering, that is fine manipulation of objects no smaller than a paperclip is limited to frequently with the bilateral upper extremities; feeling is limited to frequently with the bilateral upper extremities.
>
> This individual should have no exposure to extreme cold, no exposure to extreme, heat, and only occasional[] exposure to wetness and humidity.  This individual should have no exposure to irritants such as fumes, odors, dust and gases; should have no exposure to poorly ventilated areas.
>
> This individual should have no use of hazardous machinery; no exposure to unshielded moving mechanical parts; no driving of motor vehicles as part of the work function and no exposure to unprotected heights.  This individual is limited to occupations that do not require a fine hearing capability; does not require complex verbal communications or frequent telephone communication…. This individual is going to remember, understand and carry out only simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs.

(Tr. 74-75)  The vocational expert stated that such an individual could not perform Plaintiff's past work as a maintenance mechanic, but could perform other jobs that existed in the national economy, such as ticket seller, hand bander, and mail clerk.  (Tr. 75)  If, however, that same hypothetical individual were limited to sedentary work, he would be disabled according to the grid rules.[5]  (Tr. 75-76)  Likewise, if the hypothetical individual would either be off task fifteen percent of the workday or have one or more unscheduled absence per month, he would not be able to sustain employment.[6]  (Tr.  76)

### III.    Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 416.905(a).  The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 416.920(a).  Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity.  Id.  Second, the claimant must

---

[5] The Medical-Vocational Guidelines, or "Grid Rules," are "a set of charts listing certain vocational profiles that warrant a finding of disability or non-disability." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012) (quoting McCoy v. Astrue, 648 F.3d 605, 613 (8th Cir. 2011)).

[6] In regard to Plaintiff's medical records, the Court adopts the facts set forth in Plaintiff's statement of uncontroverted facts and admitted by the Commissioner.  [ECF Nos. 16-1, 19-1]

establish that she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." Id. at § 416.920(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quotation omitted). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Subpart P, Appendix 1. Id. at 404.1520(d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether the claimant can return to her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. § 416.920(f); McCoy, 648 F.3d at 611. If the claimant can still perform past relevant work, she will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. Id.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R § 416.920(g); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then she will be found to be disabled. Id. at § 416.920(g).

**IV.    ALJ's Decision**

7

Applying the five-step evaluation, the ALJ found that Plaintiff:  (1) had not engaged in substantial gainful activity since June 3, 2016; and (2) had the severe impairments of seizure disorder, COPD, fibromyalgia, asthma, "disorder of lumbar and thoracic spine," restless leg syndrome, "Raynaud's syndrome (phenomenon)," bilateral sensorineural hearing loss, arthritis, tricompartmental degenerative changes of bilateral knees, and tinnitus.  (Tr. 14)   The ALJ also found that Plaintiff had the non-severe impairments of "alcoholism and alcohol induced pancreatitis," left shoulder pain, depression, and anxiety.  (Tr. 15)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Id.)

The ALJ reviewed Plaintiff's testimony and medical records and found that, while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]"  (Tr. 19)  For example, the ALJ pointed to the function report completed by Plaintiff's friend Nannett Poage, which "presented a picture of the claimant as being able to do many things around the house such as fixing things, taking care of his daughter, doing laundry and other things which are more than what the claimant reports being able to do."  (Tr. 26)  The ALJ also noted that x-rays of Plaintiff's knees and left wrist and hand revealed mild or no abnormalities. (Tr. 27)

The ALJ acknowledged that Plaintiff had a "plethora of impairments which impose limitations on him," but he found that Plaintiff retained the RFC to perform a limited range of light work.  (Tr. 28)  The ALJ included the following limitations in the RFC determination:

The claimant can occasionally push and pull with the bilateral upper extremities.  The claimant can never use foot controls with the bilateral lower extremities.  The claimant can never climb ladders, ropes, or scaffolds.  The claimant can occasionally climb ramps or stairs.   The claimant can occasionally balance, stoop and crouch.  The claimant can never kneel or crawl.  The claimant can never perform overhead reaching with the bilateral upper extremities.  The claimant can frequently handle objects that is gross manipulation with the bilateral upper extremities.  The claimant can frequently finger objects that is fine manipulation of items no smaller than the size of a paperclip with the bilateral upper extremities.  The claimant can frequently feel with the bilateral upper extremities.  The claimant should have no exposure to extreme cold and heat and only have occasional exposure to wetness and humidity.  The claimant should [] have no exposure to irritants such as fumes, odors, dust and gases and poorly ventilated areas.  The claimant should have no exposure to unshielded moving mechanical parts.  The claimant should have no exposure to unprotected heights.   The claimant can never use hazardous machinery.  The claimant can never drive a motor vehicle as part of the work function.  The claimant is limited to occupations that do not require a fine hearing capability, complex verbal communications and frequent phone communications.   The claimant can remember, understand, and carry out simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs.

(Tr. 18)  Based on the vocational expert's testimony, the ALJ found that Plaintiff did not have any past relevant work but he could perform jobs that existed in significant numbers in the national economy, such as "hand bander," mail clerk, and warehouse checker.  (Tr. 28-29)  The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 30).

## V.      Discussion

Plaintiff claims that substantial evidence did not support the ALJ's decision because the ALJ erred in (1) weighing the opinion of Plaintiff's treating physician and (2) determining his RFC.  [ECF No. 16]  The Commissioner counters that the ALJ properly considered the medical opinion evidence and determined Plaintiff's RFC.  [ECF No. 19]

### A.  Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a

reasonable mind would find it adequate to support the Commissioner's conclusion." Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  A court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence support[ing] a contrary outcome."  Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).  Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]"  Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Treating physician's opinion

Plaintiff argues that the ALJ failed to properly evaluate the opinion of Plaintiff's primary care physician, Dr. Tucker.  More specifically, Plaintiff claims that Dr. Tucker's opinion was entitled to substantial, if not controlling weight, because Dr. Tucker had treated Plaintiff for six years and his opinion was consistent with the other medical records.  In response, the Commissioner asserts that the ALJ properly assigned Dr. Tucker's opinion partial weight because:  (1) many aspects of his opinion were not supported by medical evidence; and (2) it was based largely, if not entirely, on Plaintiff's self-reported limitations.

A treating physician's opinion regarding a claimant's impairments is generally entitled to controlling weight where "the opinion is well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Kraus v. Saul, No. 19-3337, 2021 WL 641375, at * 3 (8th Cir. Feb. 19, 2021) (quoting Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (internal quotation omitted)).[7]  Even if the opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight.  Id. (citing Papesh, 786 F.3d at 1132).  This rule is premised, at least in part, on the notion that the treating physician is usually more familiar with a claimant's medical condition than are other physicians.  See 20 C.F.R. § 416.927; Thomas v. Sullivan, 928 F.2d 255, 259 n.3 (8th Cir. 1991).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole."  Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ must consider the following factors in determining the appropriate weight:  length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization.  20 C.F.R. § 416.927(c).  Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation."  Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

---

[7] For claims filed on or after March 27, 2017, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources," but rather, the SSA will consider all medical opinions according to several enumerated factors, the "most important" being supportability and consistency.  20 C.F.R. § 404.1520c.  Plaintiff filed his application in 2016, so the previous regulations apply.

The earliest treatment notes from Dr. Tucker contained in the record are dated March 2, 2015.  (Tr. 349-51)  Plaintiff presented for treatment of low back pain with right sciatica, and Dr. Tucker refilled Plaintiff's methadone prescription and ordered a TENS unit.  (Tr. 350)  Plaintiff returned to Dr. Tucker's office on March 23 because he had "been in a lot of [upper back] pain" and ran out of his methadone nine days early.  (Tr. 354)  On examination, Dr. Tucker noted that Plaintiff's low back was tender over the lumbar spine musculature and he had restricted range of motion of his right lumbar, right thoracic, and right and left cervical spine.  (Id.)  Plaintiff had no spinous process or sacroiliac tender and lifting tests on both legs were negative.  (Id.)  Dr. Tucker referred Plaintiff to pain management and refilled Plaintiff's methadone, but advised him "that he needed to consider getting off of his methadone….[because i]t seemed like it was not working as well and he was not controlling the usage by running out of it early all the time."  (Tr. 355)

When Plaintiff followed up with Dr. Tucker in May 2015, he had recently seen pain management specialist Dr. Glanton, who was awaiting approval for an MRI and had "not decided yet what course of treatment will be taken."  (Tr. 501)  Dr. Tucker noted on examination that Plaintiff's lower back was tender over the lumbar musculature, there was no spinous process tenderness, no sacroiliac tenderness, and lifting tests on both legs were negative.  (Id.)  Dr. Tucker refilled Plaintiff's methadone.  (Tr. 502)

Plaintiff returned for a refill of his methadone the following month and reported that he was "doing well with his medications."  (Tr. 514)  On examination, Dr. Tucker recorded the same clinical observations as he had in May, and he advised Plaintiff that he needed to "seek the advice of  a pain management specialist" because  Dr. Tucker "did not feel comfortable prescribing methadone chronically for this pain especially anymore[.]"  (Tr. 515)  Plaintiff

affirmed that he would see a pain management specialist, and Dr. Tucker provided Plaintiff a final one-month supply of methadone.  (Id.)

About six months later, in January 2016, Plaintiff presented to Dr. Tucker seeking a "letter for career center stating that he is unable to work."  (Tr. 524)  Plaintiff informed Dr. Tucker that he had been diagnosed with fibromyalgia and was taking a combination of Lyrica and Cymbalta, which "really has helped his pain."  (Tr. 526)  Plaintiff complained of numbness in his fingers in cold weather, as well as "a lot of wheezing and coughing[.]"  (Id.)  On examination, Dr. Tucker noted:  hypalgesia of the shoulders and upper body with palpation; multiple areas of pinpoint tenderness across his extremities very consistent with fibromyalgia; cold digits without bluish or white coloration; and some wheezes in the right lung base and more wheezing and rales on the left lung field, more than just the base area.  (Tr. 527)  Dr. Tucker prescribed prednisone, moxifloxacin, and Chantix.  (Id.)

Plaintiff returned to Dr. Tucker's office about ten months later, in November 2016, requesting another "note for career center" stating that he was unable to work, medication refills, and assistance with smoking cessation.  (Tr. 622)  Dr. Tucker encouraged Plaintiff to continue his sobriety and prescribed nicotine gum, MiraLAX, and KCL tablets.[8]  (Tr. 625)

Plaintiff next presented to Dr. Tucker eight months later in July 2017 for "disability paperwork."  (Tr. 676)  Dr. Tucker recorded a lengthy medical history, as recounted by Plaintiff, detailing his treatment for back pain, vertebral fracture, herniated disc in his lumbar spine, COPD with frequent exacerbations and emphysema, seizures, osteoarthritis and polyarthralgia, and Raynaud's disease.  (Tr. 679-80)  Dr. Tucker concluded:  "In the time I have seen [Plaintiff]

---

[8] Based on Dr. Tucker's treatment notes, his physical examination was limited to Plaintiff's abdomen, which was unremarkable.  (Tr. 625)

since 2011 in June, we dealt with a number of these issues including specialist referrals and I feel that he does have chronic disability." (Tr. 680)

On examination of Plaintiff's lungs, Dr. Tucker observed "lung sounds distant bilaterally" and "some wheezes in the bases." (Tr. 681)  As to Plaintiff's spine, Dr. Tucker noted:  tenderness over the mid-thoracic spine or spinous processes; tenderness over the lower lumbar spine with effusions at the L4-L5 musculature on both sides; and negative straight leg tests on both legs. (Tr. 681)  Plaintiff had full range of motion in his extremities, reflexes +1/+4 bilaterally, and no discoloration of his fingers, but he did have "effusions of both knees and crepitus with range of motion of his knees." (Tr. 681)  Dr. Tucker's treatment notes concluded with a summary of his and Plaintiff's conversation about Plaintiff's functional abilities.[9]  (Tr. 681-83)

Based upon his conversation with Plaintiff, Dr. Tucker completed a checklist MSS on the same date. (Tr. 668-71)  Dr. Tucker stated that Plaintiff could:  frequently lift and carry less than ten pounds; stand and walk ten minutes at a time for less than two hours in an eight-work day; sit ten minutes at a time for less than two hours in an eight-hour workday; occasionally twist and climb stairs; and never stoop/bend, crouch, or climb ladders. (Tr. 668-69)  Dr. Tucker stated that Plaintiff required the ability to change positions at will, "walk around" multiple times per day for twenty minutes, and lie down ten times per eight-hour workday. (Tr. 668)  Dr. Tucker attributed these limitations to Plaintiff's limited range of motion of the knees, low back pain, and dyspnea with exertion.  (Id.)  Dr. Tucker stated that Plaintiff would require ten thirty-minute unscheduled work breaks per day as a result of muscle weakness, chronic fatigue, pain/paresthesia/numbness, and adverse effects of medications. (Tr. 671)

---

[9] In the notes of their conversation, Dr. Tucker wrote for the first time that Plaintiff "did have a somewhat ataxic gait and he walks leaned over." (Tr. 682)

In regard to manipulative functions, Dr. Tucker noted that Plaintiff could:  occasionally reach, handle, and push/pull; and never finger or feel.  (Tr. 669)   Plaintiff had to "avoid all exposure" to extreme cold due to Raynaud's syndrome and "avoid moderate exposure" to extreme heat, high humidity, fumes/odors/dusts/gases, perfume, soldering fluxes, solvents/cleaners, chemicals, pollen, and smoke.  (Tr. 670)  Finally, Dr. Tucker stated that, as a result of his impairments or treatment, Plaintiff would be absent from work more than four days per month and be off task twenty-five percent or more of the workday.  (Tr. 670-71)

Plaintiff's last recorded appointment with Dr. Tucker was in late January 2018.  (Tr. 835-38)  The reason provided for this visit was "paperwork" and "to follow [Plaintiff's] disability." (Tr. 836-37)  Plaintiff informed Dr. Tucker that several medical problems prevented him from working, including two fractured vertebra in his thoracic spine, herniated disc at L4-5, sciatica, and fibromyalgia.  (Tr. 837)  Plaintiff informed Dr. Tucker that he would like to be able to work and was "talking with his pain management specialist … who will send him to Blessing pain management in the near future.  It was their intent for him to try getting some epidurals … and potentially try doing some other things including … surgery[.]"  (Id.)  Dr. Tucker observed that Plaintiff "looked well" and was "not in visible discomfort," but noted:  tender spinous process at T5 and T6 over his thoracic spine; muscular tenderness over the lower lumbar spine on each side; positive leg lifting tests on each side; hypalgesia of his shoulders and neck; and multiple areas of pinpoint tenderness on his extremities.   (Id.)   Dr. Tucker completed the "MWA temporary disability waiver" and refilled Plaintiff's prochlorperazine for nausea.  (Tr. 838)

In his decision, the ALJ thoroughly reviewed Plaintiff's medical records, including Dr. Tucker's treatment notes, the treatment notes and evaluations of other primary care physicians and specialists, and the diagnostic imaging.  (Tr. 20-25)  The ALJ considered Dr. Tucker's MSS

15

of July 2017 and found that the "opinions presented by Dr. Tucker are not supported by the records" and were based on Plaintiff's statements, "rather than any exam or other findings by Dr. Tucker." (Tr. 27)  The ALJ therefore assigned Dr. Tucker's opinion "partial weight."[10]  (Id.)

While Dr. Tucker's clinical observations supported some functional limitations, they did not support the limitations identified in his MSS, which, if accepted, would preclude Plaintiff from performing any work.  Nothing in Dr. Tucker's treatment notes suggested that Plaintiff was unable to either sit or stand/walk for less than two hours per day.  Nor did his treatment notes support the opinion that Plaintiff could sit for only ten minutes before needing to change positions, never use his hands to finger or feel, and only occasionally use his upper extremities to reach, handle, push, and pull.  "An ALJ may justifiably discount a treating physician's opinion when that opinion is inconsistent with the physician's clinical treatment notes."  Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quotation omitted).  See also Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) ("[w]e have upheld [the] decision to discount a treating physician's [statement] where the limitations listed on the form stand alone, and were never mentioned in the physician's numerous records o[f] treatment nor supported by any objective testing or reasoning") (alterations in original and quotation omitted).

Additionally, as noted by the ALJ, the diagnostic imaging in the record did not support the extreme limitations Dr. Tucker placed on Plaintiff's use of his arms and hands.  Dr. Tucker recorded in the MSS Plaintiff's self-reported limitations to no fingering or feeling and only

---

[10] The ALJ gave "little" weight to Dr. Tucker's statements in the MSS and a January 2018 "MWA Temporary Disability Waiver Verification" that Plaintiff was permanently disabled because the question of whether a claimant is disabled is "reserved for the Commissioner."  (Tr. 27)  "[A] treating physician's opinion that a claimant is 'disabled' or 'unable to work,' does not carry 'any special significance,' because it invades the province of the Commissioner to make the ultimate determination of disability."  Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (quoting 20 C.F.R. §§ 416.927(e)(1), (3)) (citation omitted).

16

occasional reaching, handling, pushing, and pulling.  Dr. Tucker suggested that Plaintiff's swollen digits and tremulousness supported these limitations.  The ALJ, however, considered x-rays of Plaintiff's left wrist and hand, which revealed "minimal degenerative changes in the left wrist" and no acute osseous abnormality in the left wrist or hand.  (Tr. 686)  X-rays of Plaintiff's right wrist and hand showed "minimal loss of joint space in the scaphoid trapezium trapezoid joint," chronic fracture deformity in the fifth metacarpal, and no acute osseous abnormality in the right hand or wrist.  (Tr. 688)  The ALJ considered and discussed the medical imaging of record and determined that it did not justify the degree of limitations contained in Dr. Tucker's opinion. See, e.g., Murphy v. Berryhill, No. 2:15-CV-69 NCC, 2017 WL 1132345, at *4 (E.D. Mo. Mar. 27, 2017).

The ALJ also discredited Dr. Tucker's MSS because it was based on Plaintiff's self-reported limitations.  Dr. Tucker's treatment notes of the same day demonstrate that he and Plaintiff discussed the physical functions and activities contained on the checklist MSS form, and Dr. Tucker accepted and recorded Plaintiff's answers on the form.   An ALJ may award less weight to a medical opinion when that opinion appears to be based largely on a claimant's "subjective complaints rather than any objective medical evidence, such as laboratory diagnostic results or referrals to specialists."  Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016).  See also Renstrom, 680 F.3d at 1064.

Plaintiff argues that the ALJ's suspicion that Dr. Tucker merely recorded Plaintiff's self-reported limitations on the MSS was not a sufficient reason for discrediting the MSS.  In support of this argument, Plaintiff cites Biegel v. Berryhill, No. 2:17-CV-40 SPM, 2018 WL 4636091 (E.D. Mo. Sept. 27, 2018).  There, the ALJ gave "no weight" to the treating physician's opinion because the physician noted on the MSS form "that the limitations were based on 'patient

history.'"  Id. at *4.  On appeal, the court expressed skepticism that "a treating doctor's note that his opinions are based on 'patient history' constitutes an indication that those opinions were based solely on the patient's past functioning or the patient's subjective reports."   Id. at *5. Because the ALJ neither considered any of "the other relevant factors in evaluating" the doctor's opinion nor provided "good reasons" for the discounting it in its entirety, the court reversed.  Id. Unlike the ALJ in Beigel, the ALJ in this case:  (1) cited Plaintiff's diagnostic imaging as an additional reason for discrediting Dr. Tucker's opinion; and (2) did not discount Dr. Tucker's opinion entirely but rather assigned it "partial weight."

Plaintiff also contends that the ALJ erred in discrediting Dr. Tucker's opinion because "Dr. Tucker has treated Plaintiff  not for just one year, but over six years and has referred Plaintiff to multiple other doctors and has reviewed those tests and records for treatment of Plaintiff's unremitting back pain."  [ECF No. 16 at 11]  Contrary to Plaintiff's assertion, however, the Court finds only one referral to a specialist.  In March 2015, Dr. Tucker referred Plaintiff to pain management specialist Dr. Glanton, but Plaintiff saw Dr. Glanton only one time.[11]  Furthermore, while the record reflects that Dr. Tucker treated Plaintiff for about three years, Plaintiff also sought treatment from different primary care physicians after Dr. Tucker declined to continue prescribing Plaintiff methadone in June 2015.  (Tr. 394, 553, 558, 560, 562, 585, 588, 591, 597, 601-02, 739, 743)  According to Dr. Tucker's treatment notes, the purpose of Plaintiff's subsequent appointments – in January 2016, November 2016, July 2017, and January 2018 – was to obtain paperwork supporting his claim that he was unable to work.

---

[11] Although the source of the referrals is unclear, the Court recognizes that Plaintiff regularly treated with other specialists – specifically, rheumatologists Drs. Ronholm and Rizwan, and pulmonologist Dr. Farah.  Plaintiff also saw a doctor at the UP-Missouri Orthopaedic Institute in August and November 2015 and an ear, nose and throat specialist in February 2017.  (p570-76, 645-49)

Finally, Plaintiff briefly suggests that the ALJ erred in discounting Dr. Tucker's MSS because it was the only medical opinion evidence in the record relating to Plaintiff's physical limitations.  However, an ALJ need not "rely on any medical opinions so long as there was sufficient medical evidence – in total – to support the conclusions made."  Moulton v. Berryhill, No. 4:18-CV-486 SNLJ, 2019 WL 845660, at *5 (E.D. Mo. Feb. 21, 2019) (citing Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008)).  See also Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) ("[T]here is no requirement that an RFC finding be supported by a specific medical opinion.").

Importantly, the ALJ did not entirely discount Dr. Tucker's medical opinion and, in fact, adopted some of the restrictions contained therein.  For example, the RFC's limitations to occasional pushing/pulling with the upper extremities, climbing stairs/ramps, and stooping/bending were consistent with Dr. Tucker's MSS.  Also, consistent with the MSS, the RFC provided that Plaintiff could never use foot controls, kneel, crawl, or climb ladders, ropes, or scaffolds and Plaintiff should have no exposure to extreme cold.   Upon review, the Court finds that the ALJ properly evaluated Dr. Tucker's medical opinion and provided "good reasons" for assigning it partial weight.

C.  RFC

Plaintiff argues that the ALJ erred in determining his RFC because he did not account for his polyarthropy and Raynaud's phenomenon.  The Commissioner counters that the ALJ sufficiently accommodated these impairments in the RFC by including manipulative and environmental restrictions.

RFC is defined as what a claimant can do in a work setting despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. §

404.1545(a).  The ALJ must determine a claimant RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  A court will uphold an ALJ's RFC determination if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

In March 2015, Plaintiff complained to rheumatologist Dr. Ronholm that his hands were stiff, "more so in the morning," and they "sometimes … go numb."  (Tr. 359)  Dr. Ronholm diagnosed polyarthralgia, likely attributable to degenerative arthritis, and recommended Plaintiff continue his methadone and ibuprofen.  (Tr. 362)  In May 2015, Dr. Ronholm diagnosed Plaintiff with "osteoarthritis, generalized involving the bilateral knees and to a lesser extent the hands and ankles."  (Tr. 382)  In February 2016, Dr. Ronholm noted Plaintiff's report that "he has noticed his fingers being very cold and turning white with cold exposure over this last year and worsening…. He does have a couple of sores that are having a hard time healing as well on the fingertips."  (Tr. 531)  Dr. Ronholm expressed reluctance to prescribe a calcium channel blocker and advised Plaintiff "to keep his hands warm if in cold exposure for treatment of his Raynaud's phenomenon."  (Tr. 533)

About fifteen months later, in July 2017, rheumatologist Dr. Rizwan noted Plaintiff's complaints of "pain in bilateral hands including both wrists, PIP, DIP" and occasional swelling of the hands."  (Tr. 694)  In regard to Plaintiff's Raynaud's phenomenon, Dr. Rizwan noted that the condition was stable and Plaintiff "denies ever having any fingertip ulceration, and the sentence [sic] doesn't really bother him much hence I'm hesitant to start him on any medications for Raynaud and just advised him to manage it conservatively with gloves etc."  (Tr. 694, 699)  Dr. Rizwan added meloxicam to Plaintiff's regimen of Cymbalta, Lyrica, and methadone, and

ordered hand and wrist x-rays.  (Tr. 699)  As previously discussed, the x-rays revealed minimal degenerative changes in the left wrist and minimal loss of joint space in the scaphoid trapezium trapezoid joint and chronic fracture deformity fifty metacarpal on the right.  (Tr. 687-88)   Dr. Tucker examined Plaintiff that same month and noted that Plaintiff had some swelling and tremulousness in his hands.  (Tr. 682)

Before formulating the RFC, the ALJ reviewed Plaintiff's testimony, treatment records, medical opinion evidence, and diagnostic imaging.  The ALJ found that Plaintiff's arthritis and Raynaud's syndrome were severe impairments.  Nevertheless, the ALJ determined that Plaintiff had the RFC to perform light work with occasional pushing and pulling and frequent handling, fingering, and feeling with the bilateral upper extremities.   The ALJ also provided that Plaintiff could have "no exposure to extreme cold[.]" (Tr. 18)

Plaintiff argues that the ALJ erred in failing to include in the RFC greater limitations on handling and fingering.   However, a claimant bears the burden of proving his limitations.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2006).  Here, Plaintiff did not prove that his hands were impaired to the extent that it precluded frequent use of his hands.  To the contrary, Plaintiff's treatment notes and physical examinations rarely referenced Plaintiff's hand symptoms and, as the ALJ noted in his decision, the x-rays of Plaintiff's left hand and wrist showed only minimal degenerative changes and no acute osseous abnormalities.

Plaintiff's self-reported activities of daily living similarly suggested that Plaintiff's ability to handle and finger was less limited than he alleged.  At the hearing, Plaintiff testified that he was able to drive for thirty minutes at a time and his back pain, rather than hand or arm pain, precluded him from driving longer.  (Tr. 55)  Plaintiff also reported that he was able to perform his personal care (albeit with pain), prepare quick meals regularly and "full meals once a week,"

mow the law on a riding mower, sort laundry, wash dishes "a little at a time," shop for groceries, and play catch with his daughter for up to fifteen minutes.  (Tr. 59, 64-66, 240-47)  An ALJ may discount a claimant's subjective complaints of disabling pain if they are inconsistent with his activities of daily living.  Reece, 834 F.3d at 910.

An ALJ's decision is not to be disturbed "so long as the...decision falls within the available zone of choice. An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusion had [the Court] been the initial finder of fact."  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff identifies evidence supporting a different conclusion, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed for the reasons set forth above.  See Fentress v. Berryhill, 854 F.3d 1016, 1020 (8th Cir. 2017). The Court therefore finds that substantial evidence supports the ALJ's RFC determination.

**IV.  Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.  Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 8th day of March, 2021